UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| MATTHEW KING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:15-CV-245 JD |
| | ) | |
| INDIANA HARBOR BELT | ) | |
| RAILROAD, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Matthew King brings this lawsuit under the Federal Railroad Safety Act, 49

U.S.C. § 20109, *et seq.*, alleging that his employer retaliated against him for engaging in various

protected activities. The stay in this case has been lifted, and the Court now returns to address the

rest of Defendant Indiana Harbor Belt Railroad's ("IHB") motion for summary judgment [DE

55] after having dealt with the interrelated issues of standing, bankruptcy, and judicial estoppel

in its March 30, 2018, order. [DE 81][1] Also pending are two motions to strike, filed by IHB. [DE

67; DE 68] For the reasons stated herein, the Court will grant in part IHB's motions to strike, and

will grant summary judgment for IHB on all of King's retaliation claims.

### IHB'S MOTIONS TO STRIKE

Before turning to the substantive issues presented for summary judgment, the Court must

at least partially address IHB's two successive motions to strike. In its first motion, IHB seeks to

---

[1] To briefly recap the current posture of this litigation, the Court stayed all proceedings on March 30,
2018, to provide an opportunity for King's then-closed bankruptcy in the Northern District of Indiana
(Bankr. Case No. 14-20664) to be reopened. On the trustee's motion, the bankruptcy court ordered King's
bankruptcy reopened on May 7, 2018, and King amended his Schedule B and Statement of Financial
Affairs the following day to include the contingent claims that form the subject of this lawsuit. On June
22, 2018, the Court ordered the stay in this case lifted following a brief status conference with the parties
and the bankruptcy trustee. [DE 86]

strike portions of King's statement of genuine disputes for failing to comply with the Local Rules. [DE 67] IHB's second motion asks the Court to strike a corporate organization chart, various notes scribbled on some of King's exhibits, and a series of handwritten memos (King's Exhibits 2-7, 10, and 11) that King purports to have jotted down contemporaneously with the events described therein. [DE 68] Predominantly, the memos summarize conversations King claims to have had with other IHB employees about his allegations of retaliation. [DE 68 at 3-6]

The Court will focus its analysis on King's handwritten memos because King attempts to rely on two of them in particular to create an inference that IHB acted with a retaliatory motive: Exhibits 2 and 10.[2] In Exhibit 2, King recaps a conversation he had with an IHB crew dispatcher in which she told King that IHB disciplined him because he brought a lawsuit against the company. [DE 61-2] In Exhibit 10, King recites what an IHB human resources employee apparently told his union chairman (who then told King), that King's requests were being denied because of an open OSHA case. [DE 61-10] The memos themselves are hand-dated and unsigned. Neither King nor his counsel disclosed the existence of these handwritten memos prior to his deposition; he first alluded to these "statements" at the deposition itself and then later produced them to IHB via supplemental disclosure.

"When determining whether to grant a motion for summary judgment, the court may consider evidence beyond the pleadings, but may only consider evidence which would be otherwise admissible at trial." *Sissom v. Purdue Univ.*, No. 4:04-CV-72, 2006 WL 897572, at *4 (N.D. Ind. Mar. 31, 2006), *aff'd*, 207 F. App'x 715 (7th Cir. 2006) (citing *Smith v. City of Chicago*, 242 F.3d 737, 741 (7th Cir. 2000)). "To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the

---

[2] None of the remaining memos (or any of the other items subject to IHB's motions to strike), however, raise any evidence of retaliation not already addressed by the Court's discussion below.

affiant must be a person through whom the exhibits could be admitted into evidence." *Scott v. Edinburg*, 346 F.3d 752, 760 n.7 (7th Cir. 2003) (quoting 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2722, at 379-80, 382-84 (1998)); *see also Szymankiewwicz v. Doying*, 187 F. App'x 618, 622 (7th Cir. 2006). As set forth in Federal Rule of Evidence 901(a), "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."

King has not satisfied Rule 901(a) as to these handwritten memos. The memos have not been introduced by affidavit or any other sworn statement. King's own declaration [DE 61-12] makes no mention of these writings, nor do any of the declarations submitted by his attorneys. [DE 61-17; DE 75] Furthermore, the memos themselves are unsworn, so even if the Court were to consider them as individual affidavits, they would still fail for want of admissibility. *See Sexson v. State Farm Fire & Cas. Co.*, 61 F. App'x 267, 270 (7th Cir. 2003) ("On a motion for summary judgment, a court must not consider those parts of an affidavit that are insufficient" under Fed. R. Civ. P. 56(c)(4), which sets out mandatory requirements, "and the failure to follow those requirements makes the proposed evidence inadmissible during the consideration of a summary judgment motion.") (internal citations omitted); *see also Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985) (On summary judgment, affidavits are only admissible under 28 U.S.C. § 1746 if they are "made under penalties of perjury; only unsworn documents purporting to be affidavits may be rejected.").

King argues that he authenticated these documents at his deposition, but the Court does not agree. First of all, King's handwritten memos were not present at his deposition, and so he could not identify them on the record as the same documents he now submits. *Cf. First Nat'l*

*Bank Co. of Clinton, Ill. v. Ins. Co. of N. Am.*, 606 F.2d 760, 766 (7th Cir. 1979) ("When called

on to decide whether there is any genuine issue of material fact to be resolved, a district judge in

a federal summary judgment proceeding is authorized to consider … exhibits which are made

part of a deposition record.") (citation omitted); *Hackel v. Nat'l Feeds, Inc.*, 986 F. Supp. 2d 963,

968-69 (W.D. Wisc. 2013) (denying challenge to authenticity of documents where those

documents were themselves deposition exhibits). Second, after testifying that he kept "written

statements" about his interactions with fellow employees for "[his] own mind to remember"

(Deposition of Matthew King at 125:18-126:15), King provided no details to corroborate

whether the handwritten memos at issue are the same documents he vaguely mentioned on the

record. As summarized by IHB, and as independently verified by the Court, King could not

recall anything about his alleged written statements during his deposition. [DE 78 at 7-9] He

answered counsel's thorough questions about these statements almost exclusively with either

"I'm not sure" or "I don't know." King cannot fairly say that he authenticated these items at his

deposition. *See, e.g.*, *Circuitronics, Inc. v. Tech. Serv. Grp., Inc.*, No. 94 C 4072, 1996 WL

84187, at *3 (N.D. Ill. Feb. 22, 1996) (declining to consider document on summary judgment for

lack of authentication where witness stated during his deposition only that the document "was

given to [him]"; vague references to documents by a witness in a deposition do not serve to

authenticate those documents).

 Tellingly, not only did King fail to submit these handwritten memos by way of

declaration or affidavit in opposing summary judgment, but he made no effort to cure this glaring

deficiency once alerted to it by IHB's motion to strike. Despite ample opportunity to swear to the

contents of his handwritten memos, King has not made a sufficient showing that they are indeed

what he claims them to be: accurate accounts of real events.

Granted, King's failure to authenticate his handwritten memos does not itself render them meaningless at summary judgment, because the nonmoving party need only produce evidence that would be admissible in content at trial. *Stinnett v. Iron Works Gym/Exec. Health Spa, Inc*., 301 F.3d 610, 613 (7th Cir. 2002). However, King's handwritten memos will not be considered here because they would nevertheless be inadmissible at trial under the rules against hearsay. *Eisenstadt v. Centel Corp*., 113 F.3d 738, 742 (7th Cir. 1997) ("[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial."). The parties do not dispute that the handwritten memos fall under the definition of hearsay; the memos are out-of-court statements made by King and offered to prove the truth of the matters asserted therein (i.e., the events they describe). Fed. R. Evid. 801; *see also Lust v. Sealy, Inc.*, 383 F.3d 580, 588 (7th Cir. 2004) ("A memo normally is hearsay, being offered to prove the truth of a statement made out of court …."). King argues that the handwritten memos would still be admissible at trial under any of the following exceptions to the rule against hearsay: present sense impressions (Rule 803(1)); recorded recollections (Rule 803(5)); and records of a regularly conducted activity (Rule 803(6)).

King's arguments do not persuade the Court. First, his memos do not qualify as records of a regularly conducted activity under Rule 803(6). That exception requires such records be "kept in the course of a regularly conducted activity of a[n] … occupation." Fed. R. Evid. 803(6)(A). King presents no argument that his occupation as a conductor at IHB requires him to make these recordings, and nothing in the record reflects such a notion. In fact, King's counsel admitted that these memos were created for purposes of litigation. (King Dep. 128:8-12); *Lust*, 383 F.3d at 588 (The only purpose of the memoranda "was to create evidence for use in

[plaintiff's] anticipated lawsuit, and that purpose disqualifies them from admission as business records.").

Second, even assuming that King actually wrote these memos on the same dates as the events described therein, they still cannot satisfy the hearsay exception for present sense impressions. As the Seventh Circuit explained in *Lust*, "unlike some other forms of hearsay, the argument for excluding [a memo] from evidence unless it falls within one of the exceptions to the hearsay rule is compelling." 383 F.3d at 588 (holding memos written by plaintiff's supervisor documenting plaintiff's complaints about discrimination constituted inadmissible hearsay). Even when such memos are "contemporaneous with the events narrated in them, they fall outside the spontaneity exceptions in Fed. R. Evid. 803(1)-(3). The rationale for these exceptions is that spontaneous utterances … are unlikely to be fabricated, because fabrication requires an opportunity for conscious reflection." *Id.* (citing *United States v. Santos*, 201 F.3d 953, 963-64 (7th Cir. 2000); *United States v. Hall*, 165 F.3d 1095, 1108-09 (7th Cir. 1999)). Like a diary entry, King "had the opportunity to write down whatever [he] wanted to when [he made his entries]; they were not spontaneous utterances, but rather the rendition of events that [he] chose to put down on paper." *Hughes v. Indianapolis Radio License Co.*, 2009 WL 226209, at *7 (S.D. Ind. Jan. 30, 2009) (rejecting plaintiff's argument that her diary was admissible under Rule 803(1)). Theoretically, King might be able to satisfy Rule 803(1) if he could show that the he wrote his memos immediately after the events took place, but he has not made that showing here, and indeed the language used in the memos would suggest otherwise. Therefore, if this case proceeded to trial, King's handwritten memos would not be admissible as present sense impressions. *Lust*, 383 F.3d at 588 ("There is no more facile a method of creating favorable evidence than writing a self-exculpatory note. Such notes have no warrants of reliability and

allowing them to be placed in evidence would operate merely as a subsidy to the forest-products industry.").

Third, King suggests that the handwritten memos may be read into evidence at trial via Rule 803(5), which requires: (1) that the memos concern matters about which King once had knowledge but now has insufficient recollection to testify fully and accurately; and (2) that King made or adopted the memos when the matters were fresh in his memory and the memos reflect that knowledge correctly. *Collins v. Kibort*, 143 F.3d 331, 338 (7th Cir. 1998). King has made no showing that he can satisfy these elements at trial. But regardless, King overlooks the fact that the memos suffer from separate evidentiary issues of their own. For example, King's memo relating to his interaction with his union chairman contains multiple layers of hearsay:

> I asked him wut [sic] about my stuff and he told me and I quote I spoke to Mary Kay (Human Resources) about all of your stuff and she told me that everything he has or had I am gonna [sic] deny it because he has a [sic] open OSHA case.

[DE 61-10] This excerpt does not adhere to Rule 805's requirement that "each part of the combined statements conform[ ] with an exception to the rule [against hearsay]." What the union chairman heard from Mary Kay and relayed to King is itself hearsay, and King has not raised any exception that would make it independently admissible. *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc*., 811 F.3d 866, 883 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 82, 196 L. Ed. 2d 36 (2016) ("'Where a plaintiff attempts to introduce the testimony of an individual who did not personally witness the alleged … statement but was later told by another that the statement was made, such testimony is rejected as hearsay' on summary judgment.") (quoting *Schindler v. Seiler*, 474 F.3d 1008, 1011 (7th Cir. 2007)). As such, Exhibit 10 does not conform with Rule 805, and therefore will not be considered here.

As for King's call with the IHB dispatcher, King's memo states:

> I told her I don't know why they just won't leave me alone. And she said I know and didn't you … have or had something going against the company like a lawsuit now or then and I said yea now and she said well that's why so keep fighting along and good luck.

[DE 61-2] Although not raised by the parties, it could be argued that the dispatcher's statement constitutes non-hearsay, because, as an agent of IHB, her statements may qualify as a statement by a party opponent under Rule 801(d)(2). But even if that were so, "a plaintiff seeking to thwart summary judgment must comply with Federal Rule of Civil Procedure 56(e) and Federal Rule of Evidence 602, both of which require that the testimony be based on personal knowledge." *Widmar v. Sun Chem. Corp.*, 772, F.3d 457, 460 (7th Cir. 2014). King has not established that the dispatcher had personal knowledge that King was being retaliated against because of his lawsuit. In the absence of such a showing, the dispatcher's analysis is nothing more than speculation, and her statement is therefore irrelevant for the purpose of creating an inference of retaliatory animus in King's favor. *See id.* ("Personal knowledge can include reasonable inferences, but it does not include speculating as to an employer's state of mind, or other intuitions, hunches, or rumors.") (citing *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003)).

For all foregoing reasons, the Court will grant IHB's motion to strike with respect to King's Exhibits 2 and 10. The Court need not address the other items IHB seeks to strike, because the Court's conclusion on summary judgment would be the same regardless of their consideration.

## SUMMARY JUDGMENT

Aside from its arguments relating to judicial estoppel and standing (which the Court ruled on in its prior Order) IHB has moved for summary judgment on two other distinct grounds. Specifically, IHB argues for summary judgment on the merits and alternatively maintains that King's allegations based on events prior to November 2013 are barred by the statute of

limitations. The Court need not address IHB's timeliness arguments, however, because the present record cannot sustain King's prima facie case for retaliation under the Act.

## A.  Summary Judgment Standard

On summary judgment, the moving party bears the burden of demonstrating that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co*., 391 U.S. 253, 289 (1968)). In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *King v. Preferred Tech. Grp*., 166 F.3d 887, 890 (7th Cir. 1999).

## B.  Factual Background

King has worked as a switchman/conductor in IHB's transportation department since 2011. Beginning in early 2013, he engaged in various forms of conduct that he contends entitle him to protection under the Act. First, in January of that year, he filed a lawsuit against IHB under the Act (separate and apart from the instant action) in which he alleged that IHB pressured him to misreport the details of a coworker's workplace injury.[3] Next, King reported the details of

---

[3] That case eventually settled in January 2014.

a collision between two railcars at a disciplinary hearing—a collision he himself caused in September 2013. Also, in October 2013, King provided a report on yet another accident, this one resulting in severe injury to a different IHB employee, Cory Henman.[4] Last of all, King filed administrative complaints in April and August 2014 against IHB for retaliating against his participation in the following protected activities: filing his unrelated 2013 lawsuit and giving a statement on the Henman incident (or, in King's mind, refusing to cover for IHB by blaming Henman for Henman's own injury).

King argues that IHB took several actions against him in retaliation for these protected activities. For example, King received a sixty-day suspension for causing the railcar collision, based on the initial estimated damage amount. He served that suspension between October 31 and December 28, 2013. Months later, the railcar owner discovered that the cars involved did not sustain as much damage as previously thought, and so IHB retroactively decreased King's suspension and paid him for his time off. King argues that the difference between IHB's estimated damage and the actual damage amount indicates that IHB falsely inflated the estimate in order to subject him to a longer suspension.

Then, when King returned from his suspension, he alleges that his supervisors generally subjected him to unwarranted scrutiny, and in one episode, harassed King by yelling at him to get out of a supervisor's office. In August 2014, he received a reprimand for failing to uphold his responsibilities as conductor by allowing work on a job to continue while his coworker was not

---

[4] King later testified against IHB in Henman's subsequent personal injury lawsuit, in June 2015. King alleges that his decision to testify qualifies as a protected activity here. However, his testimony *post-dates* all of the retaliatory action alleged in his complaint; indeed, King could not identify any retaliatory conduct against him that occurred after August 2014. (King. Dep. 299:10-23). Therefore, King's testimony in Henman's lawsuit cannot serve as a ground for liability because it could not have been the legally proximate cause of any retaliation alleged here. *Koziara v. BNSF Ry. Co.*, 840 F.3d 873, 877 (7th Cir. 2016).

wearing the required safety equipment. Also during that year, King did not receive a boot voucher from IHB until roughly one month after requesting one (such a request normally takes only a few days) and was denied up to nine lunch claims.[5] This lawsuit followed in June 2015.

## C.    Discussion

As stated at the outset, King brings this action under the Federal Railroad Safety Act, which "forbids a railroad to discharge or otherwise discriminate against an employee for conduct protected by the Act," including: providing information about conduct the employee reasonably believes violates a safety regulation; refusing to violate or assist in violating a safety regulation; reporting a work-related injury and providing information as to any accident that resulted in injury; reporting a hazardous safety condition; and filing a complaint about railroad safety. 49 U.S.C. §§ 20109(a), (a)(1)-(4), (6), (b)(1)(A); *Koziara v. BNSF Ry. Co.*, 840 F.3d 873, 874 (7th Cir. 2016).

King alleges that he engaged in all of these activities at various times between the fall of 2013 and the summer of 2015 by: (1) refusing to misreport the details surrounding Henman's injury; (2) testifying as a witness in Henman's personal injury lawsuit; (3) refusing to waive his right to an investigatory hearing relating to a railcar collision he caused; and (4) filing complaints with the Secretary of Labor under the Act. In retaliation for these acts, King alleges that IHB "increased" the suspension he faced for the railcar collision to sixty days, failed to retroactively decrease his suspension in a timely manner, subjected him to hyper surveillance and harassment in the workplace, and reprimanded him for a safety violation.[6]

---

[5] These claims are not reimbursements for lunches bought, but rather payments that IHB provides to employees who have to work through their lunch hour.

[6] In opposition to IHB's motion for summary judgment, King also alleges for the first time that IHB retaliated against his decision to testify in the Henman lawsuit by improperly deducting money from his paychecks in July 2015. [DE 59 at 3, 14, 18, 20; DE 60 ¶ 85] This claim appeared nowhere in King's

To sustain a claim of retaliation under the Act, an employee must show that: (1) he engaged in a protected activity; (2) the employer knew that he engaged in the protected activity; (3) he suffered an adverse action; and (4) the circumstances permit an inference that the protected activity was a contributing factor in the adverse action. 29 C.F.R. § 1985.104(e)(2); *see also* 49 U.S.C. § 20109(d)(2)(A) (incorporating by reference the rules and procedures applicable to enforcement actions under 49 U.S.C. § 42121(b)); *Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 381 (7th Cir. 2018) (paraphrasing the regulation). "Once that showing is made, the rail carrier can still escape liability if it can show, by clear and convincing evidence, that it would have taken the same action absent the protected activity." *Armstrong*, 880 F.3d at 381.

The parties debate whether all of King's conduct qualifies as "protected activity," and whether IHB's responses even constitute "adverse actions." But the most critical inquiry in King's case is whether the evidence creates a genuine issue of fact as to the fourth element, and the Court will focus there. The "contributory factor" element requires King to show retaliatory animus on the part of IHB. King argues that only the Eighth Circuit employs such a requirement, and makes no effort to cite any direct evidence of retaliatory motive. [DE 59 at 17 (citing *Blackorby v. BNSF Ry. Co.*, 849 F.3d 716 (8th Cir. 2017)] King, however, is mistaken on the

---

amended complaint, and it is well established in this Circuit that a plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *E.E.O.C. v. Lee's Log Cabin, Inc.*, 546 F.3d 438, 443 (7th Cir. 2008) (citing *Grayson v. O'Neil*, 308 F.3d 808 (7th Cir. 2002)). "Federal Rule of Civil Procedure 8(a) requires that a complaint adequately plead facts to put a defendant on notice of the plaintiff's claim[.]" *Segal v. Geisha NYC LLC*, 517 F.3d 501, 505 (7th Cir. 2008). Because King's amended complaint does not allege any claims based on paycheck deductions, "any theory of liability derived therefrom is deemed waived." *Anderson v. Iacullo*, 963 F. Supp. 818, 838 (N.D. Ill. 2013) (deeming plaintiff's First Amendment retaliation claim waived at summary judgment stage where plaintiff did not include said claim in his complaint). Regardless, King has presented no evidence that these deductions were not proper, so he cannot rely on them to show a violation of the Act because he has not shown that his decision to testify was the proximate cause of IHB's decision to deduct money from his paychecks. *See Koziara*, 840 F.3d at 877-79.

law. In *Koziara*, the Seventh Circuit stated that "[t]he Federal Railroad Safety Act does not punish railroads for disciplining (including firing) employees *unless the discipline is retaliatory*." 840 F.3d at 878 (emphasis added). And since the close of summary judgment briefing in this case, the Seventh Circuit has explicitly rejected the same position for which King advocates. In *Armstrong*, the plaintiff urged the court to conclude that he did not have to prove retaliatory motive under the Act, relying—as King does here—on *Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152 (3d Cir. 2013), and *Marano v. Dep't of Justice*, 2 F.3d 1137 (Fed. Cir. 1993). 880 F.3d at 381-82. In response, the *Armstrong* court explained:

> [T]he statutory text requires a showing that retaliation was a motivating factor. The statute prohibits intentional discrimination in response to an employee's performance of a protected activity. *See* 49 U.S.C. § 20109(a) (a railroad carrier "may not discharge, demote, suspend, reprimand, or in any other way *discriminate* against an employee") (emphasis added). "[T]he essence of this intentional tort is discriminatory animus." *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014) (internal quotation marks and citation omitted). That is to say, an employer violates the statute only if the adverse employment action is, at some level, *motivated* by discriminatory animus.

> It is true that to make a prima facie case, a plaintiff is not required to conclusively demonstrate that retaliation was the only—or even main—motivation. *Id*. (citing *Coppinger-Martin v. Solis*, 627 F.3d 745, 750 (9th Cir. 2010)). That does not mean, however, that a plaintiff is not required to show that retaliation played at least some role in the decision. *Id*. (noting that "contributing factor" is a more lenient standard, but explaining that "the contributing factor that an employee must prove is intentional retaliation prompted by the employee engaging in a protected activity"). A showing of discriminatory animus, which the statute requires, necessarily includes some proof of retaliatory motive.

*Id.* at 382 (footnote omitted). King also cites to language in *Addis v. Dep't of Labor*, which describes "contributing factor" as "something less than a substantial or motivating one." 575 F.3d 688, 691 (7th Cir. 2009). But the *Armstrong* court likewise addressed *Addis* and explained that "'contributing factor' is merely a standard of causation, and it does not eliminate the need to demonstrate the existence of an improper motive. The analysis of whether the employer

possessed an improper (i.e., retaliatory) motive is separate from the analysis of whether, and to what extent, that motive influenced the employer's actions." 880 F.3d at 382 (internal citation omitted). In sum, "the plaintiff must show that discriminatory animus at least partially motivated the employer's action; merely showing a causal link between the protected activity and the employer's action does not suffice." *Jackson v. BNSF Ry. Co.*, Case No. 16-cv-5518, 2018 WL 4003377, at *4 (N.D. Ill. Aug. 22, 2018).

King argues that the record nevertheless contains sufficient circumstantial evidence to create a genuine factual dispute as to IHB's retaliatory motive. Indeed, he need not rely solely on direct evidence of retaliation. *See Renzi v. Union Pac. R.R. Co.*, Case No. 16 C 2641, 2018 WL 3970149, at *6 (N.D. Ill. Aug. 20, 2018) ("A plaintiff may make this prima facie showing by direct or circumstantial evidence.") (citing *Araujo*, 708 F.3d at 160; *Kuduk*, 768 F.3d at 790). "Temporal proximity and disparate application of company policies are two kinds of circumstantial evidence relevant to this analysis." *Id.* (citations omitted). Other kinds of acceptable circumstantial evidence include indications of pretext, an employer's shifting (or perhaps false) explanations for its actions, antagonism or hostility toward a complainant's protected activity, and a change in the employer's attitude toward the complainant after he or she engaged in protected activity. *Cyrus v. Union Pac. R.R. Co.*, No. 12-C-10248, 2015 WL 5675073, at *11 (N.D. Ill. Sept. 24, 2015).

King generally cites temporal proximity between his alleged protected activities and IHB's actions as indicative of retaliatory motive. Most heavily, he argues that he has shown a close temporal proximity from when he allegedly refused to blame Cory Henman for Henman's own injuries to when IHB suspended him for sixty days based on his involvement in the railcar collision. And relatedly, King argues that IHB's explanation for the length of his suspension—in

this case, an initial damage estimate—was false. In addition, King contends that IHB inconsistently applied its policies as to him, and that it (or, King's supervisors) began treating him differently after he engaged in protected activity. The facts, however, simply do not permit any inference of retaliation here.

      *1.     King's Sixty-Day Suspension*

Starting with King's sixty-day suspension following the September 20, 2013, railcar collision, the undisputed facts show that King caused that accident. [DE 60 ¶ 8; DE 57-8] Immediately after the accident, Shawn Reed, an IHB car department employee, created an estimate of the damage to both cars involved and emailed that estimate to management the next day, September 21. (Affidavit of Scott Winterfeldt ¶ 15); [DE 57-5] Reed estimated the combined damage total to be $15,078.04 ($692.52 for the TILX car; $14,385.52 for the GATX car). [DE 57-5] Pursuant to IHB's policies, this damage amount automatically subjected King to a sixty-day suspension because it exceeded the current Federal Railroad Administration accident reporting threshold. [DE 57-3 at 3] In 2013, that threshold was $9,900, and so IHB had to report the accident. 49 C.F.R. § 225.19(c).

By claiming that IHB increased his suspension to sixty days, King distorts the record. The facts unequivocally demonstrate that IHB's policies mandated that King face a sixty-day suspension at the outset, based on the estimated damages, and that when IHB offered to reduce King's suspension to thirty days in exchange for waiving his right to a hearing, he declined. Notably, Reed submitted the damage estimate to management the day after the collision, more than a week *before* the Cory Henman incident. This completely undermines King's argument that the temporal proximity between "his refusal to falsely blame his coworker for his coworker's injury and when IHB increased the severity of his suspension" creates an inference of

retaliation [DE 59 at 18]; King's role in the Henman incident could not have provided IHB with an improper motive to subject him to a harsher penalty for the railcar collision because IHB already determined, per its written policy, that King faced that same penalty.

True, the actual damage sustained turned out to be lower than the original damage estimate (and lower than the federal reporting threshold), and so IHB eventually reduced King's suspension retroactively from sixty to ten days—an amount negotiated between IHB and King's union—and compensated him for the extra time he spent on suspension. [DE 57-19][7] But King's suggestion that IHB falsely inflated the initial estimate finds no support in the record. The method of assigning and sharing damages between IHB and the railcar owner following any collision is thoroughly set forth in the evidence. To summarize, representatives from both IHB and the owner perform a joint inspection to estimate the damage costs. (Winterfeldt Aff. ¶ 18). This inspection can take months to finalize, and in this case, the parties did not complete it until February 18, 2014. *Id.* ¶ 19; [DE 57-6] Then, after IHB and the owner complete the joint inspection, the railcar is sent for repairs. The joint inspection only results in an estimate, however, and in some cases the actual repairs will cost more or less than the projected amount. (Winterfeldt Aff. ¶ 20). In this case, once repairs began on the damaged GATX railcar, its owner discovered that the car's inner lining did not need to be replaced as previously anticipated, and the final costs fell below the reporting threshold (hence the adjustment to King's suspension). *Id.* ¶ 21; (Deposition of Daniel Kelley 126: 20-128:13). IHB acted in compliance with its normal procedures here, and King has presented no evidence to suggest that it intentionally inflated the

---

[7] IHB made this adjustment retroactively because the car owner did not determine the actual damages until long after he served his sixty-day suspension, which ended December 28, 2013.

damage estimate to subject him to a harsher suspension, especially considering the sequence of events, discussed above.[8]

Nor has King presented any evidence that the delay in reducing his suspension stemmed from a retaliatory motive. King's suspension ended in late December 2013, but the repair costs for the railcar collision could not be accurately ascertained until sometime between February (when IHB and the car owner finalized their joint estimates) and August 2014 (when IHB updated its report to reflect the accurate damage amount). This delay comes as no surprise; IHB's transportation department head, Daniel Kelley, explained that "it can take months, even years" before IHB receives a final bill for repair costs. (Kelley Dep. 174:3-4). IHB then did not update its federal report on this incident until November 2014, but it has also presented evidence that this delay can be attributed to a health-related absence of its regulatory and compliance manager during this time, who otherwise regularly updates the reports. (Winterfeldt Aff. ¶ 23). Finally, IHB reduced King's suspension in February 2015. [DE 57-19] The record indicates many sources for this general delay, but King has not created an inference that retaliation was one of them.

### 2. King's Rule 941 Reprimand for His Coworker's Conduct

King also contends that he is "the only employee ever to be disciplined for a **coworker's** failure to wear personal protective equipment." [DE 59 at 17 (emphasis in the original)] IHB charged King with violating Rule 941 of the Northeast Operating Rules Advisory Committee. Rule 941 governs conductor responsibilities, and on August 12, 2014, King was serving as conductor when his coworker failed to wear a safety vest as required. (Kelley Dep. 133:10-19;

---

[8] For these same reasons, King cannot allege that IHB's "increase" of his suspension constitutes an adverse action. No such increase ever took place.

King Dep. 32:16-34:3). As conductor, it was King's responsibility to halt all operations until his coworker became compliant with the safety vest requirement, but he failed to do so and thus ran afoul of Rule 941. (Kelley Dep. 133:21-134:16). In 2014 alone, IHB reprimanded its conductors via Rule 941 at least twelve other times and on a variety of grounds, such as running through switches and red signals, failing to inspect equipment and conduct air tests, failing to sound the horn when passing another train, and derailments. [DE 57-21] The fact that IHB may not have previously issued a Rule 941 violation predicated on a coworker's failure to wear his or her safety equipment does not equate to inconsistent application of the rules, as King suggests. IHB routinely disciplines its conductors for failing to comply with Rule 941, and that is precisely what it did in King's case; that King's violation stemmed from a coworker's failure to wear a safety vest as opposed to something else is pure chance. *See Jackson*, 2018 WL 4003377, at *4 (granting summary judgment where the employer railroad "followed its normal policies" by disciplining plaintiff for his role in starting a fight). Indeed, he has presented no evidence of similar incidents in which conductors did *not* receive discipline for allowing prohibited conduct to occur.

3.    *King's Perceived Changes in IHB's Attitude*

Additionally, King has not shown a change in IHB's attitude toward him following his protected activity. Regarding his lunch claims, King maintains that he never had a claim denied prior to the railcar collision in September 2013. (King Dep. 150:21-24). But he infers retaliatory motive by identifying nine instances in 2014 in which IHB denied his claims. *Id.* at 168:20-170:13; [DE 61-8] In six of those episodes, King's claims were denied along with those of his crewmembers; in the other three, his claims were denied while other crewmembers had theirs granted. *Id.* But this small sample does not permit an inference that IHB denied King's lunch

claims in retaliation for his protected conduct. According to Kelley, IHB denies an average of fifty employee lunch claims per month (Kelley Dep. 165:18-22), and so King would be hard-pressed to say that he was treated any differently than his coworkers. Moreover, IHB produced records of *dozens* of approved lunch claims for King during 2014. [DE 64-6] So, all King can stand on here is temporal proximity: before the railcar collision, IHB always approved his lunch claims; after the collision, IHB denied a handful. The Seventh Circuit has not yet decided whether temporal proximity alone can satisfy the contributing factor element, but the Eighth Circuit has held that it cannot. *See Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 792 (8th Cir. 2014); *Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 723 (8th Cir. 2008), *cert. denied*, 555 U.S. 1137 (2009). Considering the entire factual backdrop surrounding King's lunch claims, the Court agrees that temporal proximity alone cannot create an inference of retaliatory animus here. *See Jackson*, 2018 WL 4003377, at *5 (granting summary judgment for employer where only temporal proximity weighed in plaintiff's favor).

Furthermore, the fact that King's supervisor Rob Musgrove told King to "get the F out of his office" does not demonstrate a change in attitude toward King, especially considering King's own testimony that that was certainly not the first time he had heard such language used on the railroad and that "everybody" uses that word. (King Dep. 187:10-188:14). And as for IHB's alleged failure to timely provide him with a boot voucher, the record indicates that IHB indeed attempted to send King a voucher as soon as he requested one, in early July 2014, but the voucher was then returned to sender by the postal service. [DE 64-5] IHB then mailed another boot voucher within a month of attempting to send the first voucher, and King received it and purchased his boots on August 11, 2014. (King Dep. 228:14-231:20). Regarding the alleged hyper surveillance on the job, King has presented no evidence that IHB subjected him to

heightened workplace scrutiny in retaliation for his protected conduct. The record suggests there may be other reasons that led to the supervision King alleges, such as the fact that he admitted to causing a railcar collision or the fact that railroad supervisors are required to record a certain number of workplace safety observations. (Kelley Dep. 87:20-90:1). But nothing in the record links King's alleged hyper surveillance to his protected conduct. Nor can King rely on his administrative complaints or his unrelated 2013 lawsuit as providing a basis for IHB's purported retaliation, because he has presented no evidence that any of his supervisors even knew that he filed such claims.[9] *See Cyrus*, 2015 WL 5675073, at *10 (granting summary judgment for employer where plaintiff presented no evidence that his employer suspected or had constructive knowledge that he had engaged in protected activity under the Act).

In sum, the record contains no evidence—direct or circumstantial—that creates a genuine dispute of fact as to whether IHB retaliated against King because of his alleged protected activity. Again, the Act requires plaintiffs to satisfy the "contributory factor" element by demonstrating that retaliatory motive played at least some part in an employer's alleged adverse action. *Armstrong*, 880 F.3d at 381-82; *Koziara*, 840 F.3d at 877-79. Without having done so here, King cannot sustain his claims under the Act, and summary judgment must issue.

## CONCLUSION

For the all the reasons stated herein, the Court GRANTS IHB's motion to strike King's Exhibits 2 and 10, but DENIES all other relief requested in the motions to strike as moot. [DE

---

[9] The portion of Kelley's deposition cited by King to rebut this point does not indicate that Kelley knew King filed any complaints. Kelley only indicated that he knew King was "somehow involved" in prior complaints made while King worked for IHB's maintenance department. (Kelley Dep. 141:4-11). In fact, Kelley further testified that he "didn't really know [King] filed a complaint;" Kelley knew complaints had been filed in the department but that he did not know "who the players were." *Id.* at 140:4-8.

67; DE 68] The Court also GRANTS IHB's motion for summary judgment on all of King's claims. [DE 55] The Clerk is directed to enter judgment.

SO ORDERED.

ENTERED:  November 13, 2018

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court